IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANK OF AMERICA, NATIONAL ASSOCIATION, as successor by merger to LASALLE BANK NATIONAL ASSOCIATION, | ) ) ) ) | Case No. 12 C 9612 |
| Plaintiff, | ) ) ) | Judge John Z. Lee |
| v. | ) ) | Magistrate Judge Susan Cox |
| WELLS FARGO BANK, N.A. in its Capacity as Trustee for the Certificateholders of Commercial Mortgage Pass-Through Certificates, Series 2006-MF4, Acting by and through MIDLAND LOAN SERVICES, | ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |
| LASALLE COMMERCIAL MORTGAGE SECURITIES, INC., SERIES 2006-MF4 TRUST, acting by and through its Master and Special Servicer, MIDLAND LOAN SERVICES, a division of PNC Bank, National Association, and whose Trustee is WELLS FARGO BANK, N.A., | ) ) ) ) ) ) ) ) ) | Case No. 13 C 5605 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BANK OF AMERICA, NATIONAL ASSOCIATION, as successor in interest to LaSalle Bank National Association | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The two cases before the Court arise out of a dispute regarding the sale and securitization of mortgage loans. LaSalle Commercial Mortgage Securities, Inc., acting by and through

Midland Loan Services ("Midland"), alleges that Bank of America, National Association ("Bank of America"), as successor in interest to LaSalle Bank National Association, breached various representations and warranties with respect to certain mortgage loans that were transferred pursuant to a December 20, 2006, Mortgage Loan Purchase Agreement ("MLPA").

In September 2012, Midland demanded that Bank of America repurchase the mortgage loans under a related Pooling and Servicing Agreement, dated December 1, 2006 ("PSA"). In response, Bank of America filed suit (Case No. 12 C 9612), seeking a declaratory judgment that it had not breached the representations and warranties in question. Not to be outdone, Midland also filed suit (Case No. 13 C 5605), seeking a court order requiring Bank of America to repurchase the mortgage loans at the applicable Purchase Price as specified in the PSA.

During discovery, Bank of America requested that Midland produce its loan servicing guidelines. Bank of America argues that the servicing guidelines are relevant because any damages that it may owe Midland as a result of the alleged breaches must be mitigated to the extent that Midland's deficient servicing of the loans contributed to the claimed injury. In response, Midland contends that traditional mitigation principles have no application where, as here, the relief is contractually specified.

In an effort to narrow the disputed issues, the Court requested supplemental briefing from the parties regarding the applicability of the doctrine of mitigation to this action. For the reasons discussed herein, the Court finds that, under the terms of the PSA, once a loan has been identified for repurchase, Midland has a duty to mitigate any damages with respect to such loan by servicing the loan in a manner consistent with the terms of the PSA. Therefore, the guidelines utilized by Midland to service the loans at issue are discoverable under Federal Rule of Civil Procedure 26(b)(1).

**Factual Background**

Under the MLPA, LaSalle Bank National Association ("LaSalle Bank") agreed to sell a pool of residential mortgage loans to LaSalle Commercial Mortgage Securities, Inc. ("LaSalle Commercial"). LaSalle Bank and LaSalle Commercial previously had entered into the PSA, which also included as parties Midland Loan Services, Inc. ("Midland"), as the Master Servicer and Special Services of the mortgage loans, and Wells Fargo Bank, N.A. ("Wells Fargo"), as the Trustee of the LaSalle Commercial Mortgage Services Trust 2006-MF4 (the "Trust"). Under the PSA, the mortgage loans sold by LaSalle Bank to LaSalle Commercial were transferred through the Trustee Wells Fargo to the Trust, which in turn issued certificates to various Certificateholders, thereby securitizing the mortgage loans. Bank of America subsequently acquired LaSalle Bank on October 1, 2007 (the Court hereafter will refer to LaSalle Bank as Bank of America).

The PSA also bestowed upon Midland (as the Master and Special Servicer) a number of obligations. For example, pursuant to Article III of the PSA, Midland had various servicing obligations with respect to the mortgage loans at issue, *see generally* PSA, Def.'s Br., Ex. 1 at 76-124, including the requirement under Section 3.01 that it service the mortgage loans under a minimum standard of care "with a view to the maximization of recovery of principal and interest[.]" PSA § 3.01, *id.* at 76.[1] Under other sections of the PSA, Midland was required to

---

[1] Midland "shall service and administer the Mortgage Loans . . . in accordance with the higher of the following standards of care: (1) in the same manner in which, and with the same care, skill, prudence and diligence with which [Midland] administers similar mortgage loans for other third-party portfolios and (2) with the same care, skill, prudence and diligence with which [Midland] administers similar mortgage loans owned by [Midland.]" PSA § 3.01, Def.'s Br., Ex. 1 at 76.

make reasonable efforts to collect all payments due under the mortgages[2] and apply all payments collected to amounts due to the related mortgage note.[3] Midland also has the obligation "for the benefit of the Certificateholders and the Trustee . . . [to] enforce the obligations of [Bank of America] under the [MLPA]." PSA § 2.03(e), *id.* at 74.

Turning to the present cases, Bank of America made a number of representations and warranties in the MLPA with respect to the mortgage loans sold to LaSalle Commercial. Midland, acting in its capacity as the Master and Special Servicer, alleges that Bank of America breached several of these representations and warranties. As a result of the breaches, in September 2012, Midland demanded that Bank of America repurchase the mortgage loans at issue (the "repurchase loans"). After Bank of America refused to repurchase the mortgage loans, the instant lawsuits followed.

Midland argues that Bank of America must repurchase the loans as specified in the PSA. Section 2.03(b) of the PSA provides that

> [in the event of] . . . a breach of any representation or warranty with respect to a Mortgage Loan . . . [Bank of America must] (i) cure such Defect or Breach . . . [;](ii) repurchase the affected Mortgage Loan or REO Loan at the applicable Purchase Price . . .[;] or (iii) substitute a Qualified Substitute Mortgage Loan.

PSA § 2.03(b), *id.* at 72.[4] At issue is the second remedy available to Midland—the repurchase of the mortgage loans at the Purchase Price.

---

[2] Midland "shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans it is obligated to service hereunder, and shall follow such collection procedures as are consistent with this Agreement[.]" PSA § 3.02(a), Def.'s Br., Ex. 1 at 79.

[3] "All amounts collected on any Mortgage Loan or Companion Loan in the form of payments from Mortgagors, Insurance and Condemnation Proceeds or Liquidation Proceeds shall be applied to amounts due and owing under the related Mortgage Note and Mortgage[.]" PSA § 3.02(b), Def.'s Br., Ex. 1 at 80.

[4] Similarly, Section 6(e) of the MLSA provides that, once notified of a defect or breach related to a mortgage loan, Bank of America has 90 days to either cure the defect or breach or buy back the affected

Under the PSA, the Purchase Price is composed of various components including: (i) the outstanding principal balance of a given mortgage loan; (ii) all accrued and unpaid interest on such mortgage loan; (iii) all related Servicing Advances that are not reimbursed; (iv) all reasonable out-of-pocket expenses incurred in connection with breaches of representations and warranties that give rise to a repurchase obligation; and (v) liquidation fees. PSA, *id*. at 46.[5]

Bank of America contends that, assuming it had breached the representations and warranties in the MLPA, Midland had an obligation under New York common law to mitigate any damages that it might have suffered as a result. It is for this reason, at least according to Bank of America, that it is entitled to review the servicing guidelines used by Midland to service the mortgage loans so that it can determine whether Midland serviced the repurchase loans properly, thereby mitigating its damages.

Midland responds that the production of the servicing guidelines is unnecessary because the Purchase Price is the parties' contractually bargained for (and exclusive) remedy that allocates the risk resulting from any breach (including all associated damages) to Bank of America. Under this reasoning, the manner in which Midland serviced the loans is immaterial. In the alternative, Midland argues that the Purchase Price is a liquidated damages provision not

---

loan at the designated "Repurchase Price." It goes on to define "Repurchase Price" as the "meaning given to the term 'Purchase Price' in the [PSA]." MLPA § 6(e), Def.'s Br., Ex. 2 at 8.

[5] The Purchase Price is equal to "(i) the outstanding principal balance of such Mortgage Loan (or related REO Loan) as of the date of purchase; plus (ii) all accrued and unpaid interest on such Mortgage Loan (or the related REO Loan) at the related Mortgage Rate in effect from time to time . . .; plus (iii) all related Servicing Advances that are unreimbursed out of collections from the Mortgage Loan and accrued and unpaid interest on related Advances at the Reimbursement Rate, and any Special Servicing Fees . . .; plus (iv) if such Mortgage Loan (or REO Loan) is being purchased by the Mortgage Loan Seller pursuant to Section 6 of the Mortgage Loan Purchase Agreement, to the extent not otherwise included pursuant to clause (iii), all reasonable out-of-pocket expenses reasonably incurred or to be incurred by the Master Servicer [or] the Special Servicer . . . in respect of the Breach or Defect giving rise to the repurchase obligation . . .; plus (v) Liquidation fees, if any, payable with respect to such Mortgage Loan." PSA, Def.'s Br., Ex. 1 at 46.

subject to mitigation and hence discovery into its servicing guidelines is not relevant for this independent reason. *See* Pl.'s Br. 2-10.

## Legal Standard

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.] . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Relevance in discovery is broader than relevance at trial; during discovery, "a broad range of potentially useful information should be allowed" when it pertains to issues raised by the parties' claims. *N.L.R.B. v. Pfizer, Inc.*, 763 F.2d 887, 889-90 (7th Cir. 1985).

Furthermore, in construing the operative agreements, the Court will apply New York law pursuant to the parties' agreement. *See* PSA § 11.04, Def.'s Br., Ex. 1 at 212-13; MLPA § 11, *id.*, Ex. 2 at 12. In so doing, the Court reviews the agreements to determine the intent of the parties based upon the language of the agreements, *see Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (internal citation omitted), while giving each contractual provision "consistent meaning in their overall context." *Deutsche Alt-A Sec. Mortg. Loan Trust v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 498 (S.D.N.Y. 2013).

## Discussion

Bank of America argues that Midland's servicing guidelines are relevant to calculating damages because any damages that it may owe under the repurchase provision in the PSA is subject to common-law mitigation principles. In turn, Midland contends that general mitigation principles do not apply because the repurchase provision provides an exclusive remedy. Based upon the language of Section 2.03 and the terms of the PSA, the Court finds that Midland has a

duty to mitigate any damages that may have incurred post-default as a result of the alleged breaches. Thus, Midland's servicing guidelines are relevant to the issue of damages and the proper subject of discovery.

### I. Section 2.03 of the PSA

Section 2.03 of the PSA provides that, in the event of a "breach of any representation or warranty with respect to a Mortgage Loan," Bank of America shall "repurchase the affected Mortgage Loan or REO Loan at the applicable Purchase Price." PSA § 2.03(a), Def.'s Br., Ex. 1 at 72. As noted, the Purchase Price is calculated by adding together several components, including the outstanding principal and the unpaid interest on the loans. PSA, *id*. at 46. In turn, the amount of the outstanding principal on a particular loan could be affected if Midland had serviced the loan in a deficient manner. For example, if Midland had failed to make reasonable efforts to collect all payments due under a loan or to apply all amounts collected to amounts due on the note (as required under Section 3.02 of the PSA), the outstanding principal of the mortgage loan would be greater than it would be otherwise. In such an instance, Bank of America would be required to pay a higher Purchase Price when repurchasing the loan due to Midland's deficient servicing. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. 3:07-CV-449, 2010 WL 2873661, at *2 n.4 (S.D. Ohio July 19, 2010). Thus, it is quite possible that the manner in which Midland serviced a particular loan post-default would affect the Purchase Price that Bank of America would have to pay upon repurchase. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, CIV-08-1125-C, 2011 WL 3739170, at *6 (W.D. Okla. Aug. 23, 2011) (finding that to the extent plaintiff's failure to service mortgage loans adequately post-default impacted the Purchase Price, that "amount should be offset as a failure to mitigate").

Additionally, once Bank of America repurchases a loan under Section 2.03, it obtains the "legal and beneficial ownership of such repurchased . . . Mortgage Loan (including property acquired in respect thereof or proceeds of any insurance policy with respect thereto)." PSA § 2.03(c), Def.'s Br., Ex. 1 at 74. The value of the loan (and/or related property or insurance proceeds) returned to Bank of America also could have been impacted negatively by the manner in which Midland serviced the loan as a Master Servicer and/or Special Servicer (for example, if Midland had failed to maintain appropriate levels of insurance, *see* PSA § 3.07(a), *id.* at 96-97). Accordingly, the manner in which Midland serviced a repurchase loan would be relevant to the calculation of the Purchase Price and the value of the loan or collateral given in exchange.

In response, Midland argues that the "breach, and the material and adverse effect, are determined as of the securitization date," and therefore "Midland's post securitization servicing of the Loans is irrelevant to the issue of [Bank of America's] liability" for breach of warranty. Pl.'s Br. 2. But the timing of a purported breach is distinct from the magnitude of damages that Bank of America would have to pay, once a breach is proven.

Midland's additional argument that Section 2.03(d) of the PSA precludes mitigation is unpersuasive. That section provides that the Purchase Price is the "sole remedy available to the Certificateholders . . . or the Trustee on behalf of the Certificateholders, with respect to any Defect in a Mortgage File or any Breach of any representation or warranty." PSA § 2.03(d), Def.'s Br., Ex. 1 at 74. By its very terms, however, this clause limits the damages available to the Certificateholders and Trustee; it does not answer whether Midland has an obligation to mitigate those damages post-default.

## II. Risk Allocation and the Structure of the PSA

When construing the PSA, the parties—and the cases they cite—not only rely upon the specific language of the relevant provisions, but also spend much time discussing the allocation of risk dictated by the terms and overall structure of the PSA. In this regard, Midland argues that the servicing guidelines and any servicing failures are not relevant to Purchase Price damages because the repurchase provision in the PSA allocates the risk of any breach of representation or warranty (and all consequences of such breach) to the seller, Bank of America. *See* Pl.'s Br. 5. Bank of America argues that because the PSA imposes upon Midland certain servicing obligations independent of whether a breach has occurred, it did not agree to assume the risk of loss associated with Midland's failure to perform those obligations. Def.'s Reply 4.

When considering the allocation of risks and the availability of mitigation, courts have recognized "the discord as to the extent [commercial mortgage-backed securities] case law allows a full mitigation of damages defense[.]" *Wells Fargo*, 2011 WL 3739170, at *5. In what the parties refer to as the "C-III" decision, *Wells Fargo Bank, N.A. v. Bank of Am., N.A.* No. 10 CV 9584 (JPO), 2013 WL 1285289, at *11 (S.D.N.Y. Mar. 28, 2013), the court rejected without discussion a general mitigation defense "given the risk allocation behind repurchase provisions[.]" Likewise, the First Circuit has interpreted New York law to require that "from the moment a proper repurchase demand was made, [the seller]—not [the buyer]—should have borne the risk of any market fluctuations." *Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 18 n.14 (1st Cir. 2002). Other courts have permitted defendants in repurchase actions to offer evidence related to mitigation in certain limited circumstances. *See. e.g.,Wells Fargo Bank, N.A.*, 2010 WL 2873661, at *2 (permitting loan seller to offer mitigation evidence post-default).[6]

---

6  *See also Trust for Certificate Holders of Merrill Lynch Mortg. Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 CV 9890, 2005 WL 2582177, at *7 n.84 (S.D.N.Y. Oct. 11,

When it comes to assessing the PSA's allocation of risk and whether it imposes upon Midland the duty to mitigate its damages, it is important to define as specifically as possible the scope of the risk that each party to the PSA agreed to bear. To do so, of course, we once again turn to the terms of the agreement itself.

We have already addressed Section 2.03, which generally speaking requires Bank of America to cure or repurchase a defective loan once Midland has identified a breach of a representation and warranty and provided Bank of America with notice and an opportunity to cure. If Bank of America decides to repurchase the loan, it must do so at the Purchase Price. As noted, although the provision does relieve Midland of certain burdens to prove their actual damages, the amount of the Purchase Price, as it is defined, can be impacted to the extent that Midland serviced a repurchase loan in a deficient manner. Additionally, the value of the collateral that Bank of America would receive in any repurchase transaction also could be impacted negatively by Midland's deficient servicing of the loan. Nevertheless, Midland urges the Court to find that Section 2.03 allocated to Bank of America the risks of all damages arising out of a breach of a representation and warranty (even if a portion of the damages was caused by Midland's own deficient servicing of the loan). Such an expansive interpretation, however, not only flies in the face of Section 2.03, for the reasons discussed above, but other provisions of the PSA as well.

Critically, separate and apart from Section 2.03, the provisions in Article III of the PSA also impose upon Midland certain obligations with respect to the loans in questions, including,

---

2005) (issue of timely notice bearing on whether plaintiff "aggravated its injuries stemming from [Defendant's] breach" allowed for application of mitigation); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 47 A.D.3d 103, 107, 846 N.Y.S.2d 95, 99 (N.Y. App. Div. 2007) (noting a critical issue was whether plaintiff took "necessary steps to protect the value of the investment property, thereby unreasonably failing to mitigate damages").

*inter alia*, the obligation to service the mortgage loans using a certain standard of care, to make a reasonable effort to collect all payments, to apply all payments collected to the corresponding mortgage loan, and to maintain certain levels of insurance. PSA §§ 3.01, 3.02(a)-(c), Def.'s Br. Ex. 1 at 76, 79-81. When read in conjunction with Section 2.03, it is clear that, although Bank of America may have agreed to bear the risk of certain events that would impact the damages caused by a breach (for example, fluctuations in the real estate market), it did not agree to bear the risk that Midland, a party to the agreement, would fail to comply with its independent obligation to adequately service the loans in question.

The decisions from the courts in Oklahoma and Ohio are in accord with this reasoning. *See Wells Fargo Bank, N.A.*, 2011 WL 3739170, at *6 (finding that "the parties did not allocate to Defendant the risk of any failure by the special servicer in servicing the loans post-default"); *Wells Fargo Bank, N.A.*, 2010 WL 2873661, at *2 (finding that "one cannot infer from the MLPA and PSA that the risk of inadequate servicing of the loans post-default was allocated to LaSalle[,] . . . [and] LaSalle may offer evidence of [the servicer's] failure to perform its duties . . . to the extent those failures have increased the purchase price").[7] What is more, to the extent that the cases upon which Midland relies address risks beyond the control of the parties post-default, they are not inconsistent with this ruling. *See, e.g., Resolution Trust Corp.*, 280 F.3d 12 at 18 n.14 (noting that the seller "should have borne the risk of any market fluctuations").[8]

---

[7]  Midland also argues that whatever duties it may owe to service the loans in a proper manner were owed to the Trust and Certificateholders, and not Bank of America. But, Bank of America is not asserting a claim against Midland for breaching its servicing obligations, rather it is arguing that Midland should not benefit by collecting damages under Section 2.03 that Midland itself may have caused.

[8]  In support of its argument, Midland also cites *LaSalle Bank Nat'l Ass'n v. Capco Am. Securitization Corp.*, No. 02 CV 9916 (RLC), 2005 WL 3046292, at *5 n.12 (S.D.N.Y. Nov. 14, 2005). As Bank of America points out, however, the defendant in *Capco* waived its right to challenge the method of calculating damages. *See LaSalle Bank, Nat'l Ass'n v. Capco Am. Securitization Corp.*, 02 CV 9916 (RLC), 2006 WL 1227539, at *1 (S.D.N.Y. May 5, 2006*)* ("Capco should not have waited until after

11

Finally, general principles of mitigation under New York law support the Court's finding that Bank of America did not bear the risk of deficient servicing where a loan has been identified for repurchase. "The social policy behind the duty to mitigate damages stems from the desire to hold defendants liable for harms they cause but not also for damages the plaintiff could have reasonably avoided. Such a policy encourages a plaintiff to react sensibly and cautiously to the harm imposed by the defendant." *Ridgeview Partners, LLC v. Entwistle*, 354 F. Supp. 2d 395, 403 (S.D.N.Y. 2005) (internal citation omitted). Thus, once Midland identified loans for repurchase, it had an obligation to mitigate its damages by servicing the loans according to the terms of the PSA. *See Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985) (noting that when plaintiffs learned that defendant intended to breach the contract "[t]hey were obligated to take whatever reasonable actions they could to minimize their damages").

For these reasons, the Court finds that the seller, Bank of America, did not bear the risk that Midland would service the repurchase loans in a defective manner post-default. As a result, to the extent that Midland did so, such facts would be relevant to the issue of mitigation and therefore discoverable.

**II. Whether the Purchase Price Is a Liquidated Damages Clause**

Lastly, Midland argues that Section 2.03(b) constitutes a liquidated damages clause not subject to general mitigation principles. Under New York law, a liquidated damages provision "must specify a sum certain . . . [in order to] preclude the 'difficulties of requirements of certainty of proof' that characterize the process of substantiating an unliquidated amount of damages." *CIT Grp./Commercial Servs., Inc. v. Holladay-Tyler Printing Corp.*, No. 94 CV 6642

---

summary judgment was granted to contest LaSalle's evidence on how the mortgage's repurchase price should be calculated; by waiting, Capco waived its objections."). *LaSalle Bank Nat. Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618 (D. Md. 2002), likewise is distinguishable because it involved risks that were known (or should have been known) prior to the transfer of the loan. *Id.* at 631 (noting that the seller "assumed the risk that the mortgaged property was environmentally contaminated").

(HB), 1995 WL 702343, at *1 (S.D.N.Y. Nov. 29, 1995) (quoting *Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 426 (N.Y. App. Term 1967). "[L]iquidated damages clauses must specify an amount either in absolute dollars or in some manner that obviates foreseeable court involvement." *Id*. "If court action is necessary in order to fix the amount [of damages], the stipulation is meaningless, as it fails to achieve the only valid purpose of liquidated damages." *Id*. (internal quotations omitted).

Here, the repurchase provision at issue does not meet the requirements to be considered a liquidated damages clause under New York law. The fourth component of the Purchase Price—"all reasonable out-of-pocket expenses incurred in connection with breaches of representations and warranties," PSA, Def.'s Br., Ex. 1 at 46—will no doubt be subject to dispute by the parties and will therefore require involvement of the Court. As such, the repurchase provision cannot be a liquidated damages clause. *See Wells Fargo*, 2011 WL 3739170, at *4 ("Reasonableness requires a determination by a court, which . . . precludes this clause from satisfying the requirement of being for an amount certain."); *see also Wells Fargo*, 2010 WL 2873661, at *1 (court not "persuade[d] . . . that New York law requires the repurchase remedy to be analyzed as a liquidated damages clause").

Midland relies on *Capco*, a case in which the court held that a mortgage repurchase provision "provide[d] for liquidated damages in the event that a breach cannot be cured . . . because damages in cases such as this one would be exceptionally difficult to calculate." *Capco*, 2005 WL 3046292, at *5. But, again, *Capco* is distinguishable on the ground that the seller that case "waived its right to challenge the damage calculation formula," making the calculation of damages a "ministerial" task of "[u]pdating the mortgage repurchase price by inserting new data into an undisputed calculation formula . . . requir[ing] only mathematics and no legal judgment."

*Capco*, 2006 WL 1227539, at *2.  The Court finds that the calculation of the Purchase Price here will likely require judicial involvement beyond the minimal action contemplated in *Capco* and therefore, the repurchase provision cannot be construed as a liquidated damages clause.

## Conclusion

For the reasons discussed herein, the Court concludes that Midland's servicing guidelines are relevant and discoverable under Federal Rule of Civil Procedure 26(b).


**SO ORDERED**                                    ENTER:   7/23/14

                                                                 _____
                                                                 **JOHN Z. LEE**
                                                                 **United States District Judge**